UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Cr. No. 21-309 (ABJ) |
| ) | |
| RUSSELL JAMES PETERSON, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## SENTENCING MEMORANDUM

Mr. Russell Peterson, through undersigned counsel, respectfully submits this memorandum requesting that this Court consider his entire life in determining a fair and just sentence.

## BACKGROUND

On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the results.[1] The rally was set for January 6, 2021, the same date Congress was set to certify Joe Biden as the winner. On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's start.[2] A number of speakers took to the stage, including some high-profile figures in the Republican Party. Representative Mo Brooks (R-Ala.) urged "American patriots" to "start

---

[1] President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!" *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

[2] Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants. *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

taking down names and kicking ass."[3] Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4] Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5] Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6] Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are all watching."[7] Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[8]

Finally, around noon, President Trump took to the stage. For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't

---

[3]   *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachment-stop-the-steal-speakers-467554.

[4]   *Id*.

[5]   *Id*.

[6]   *Id*.

[7]   *Id*.

[8]   *Id*.

let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[9]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10] At approximately 12:50 p.m., those same attendees breached the outer barricades of the U.S. Capitol grounds.[11] The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[12] The MPD arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West. But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[13]

When President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol. By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building. Officers

---

[9]   See Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]  See Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; see also Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[11]  *Id*.

[12]  *Id*.

[13]  *Id*.

3

were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building.  This breach spurred the evacuation of members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[14]

Following the building's breach, Mr. Peterson entered the Senate Wing Door at approximately 2:23 pm.  *See* PSR ¶ 18, pg. 5.  While inside the Capitol, Mr. Peterson live-streamed videos on Facebook.  *See* PSR ¶ 19, pg. 5.  Approximately one hour later, Mr. Peterson drove back to Pennsylvania.  *Id.*

On February 9, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Peterson with four misdemeanor offenses.  *See* ECF # 1.  On February 12, 2021, Mr. Peterson was arrested in the Western District of Pennsylvania.  *See* ECF #10.  He was released the same day of his arrest and ordered to appear before Magistrate Judge Robin M. Meriweather on February 23, 2021.  On February 23, 2021, he appeared as directed and was ordered released.  *See* PSR ¶ 8, pg. 4.

On April 19, 2021, an Information was filed charging him with Count One, Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Count Two, Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); Count Three, Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Four, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  *See* ECF # 7.

---

[14]     *Id*.

On September 8, 2021, this Court accepted Mr. Peterson's guilty plea to Count Four of the Information, and scheduled his sentencing for December 1, 2021.  *See* ECF #20-22.

## ARGUMENT

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense," as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less.  The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors.  *See* U.S.S.G. §1B1.9.  Additionally, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment, 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow.  *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Because the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."  Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense."  *Id*. at (2)(A).  Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  *Id*. at 2(B-D).  Further still, the Court must be mindful of "the kinds of sentences available,"

should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

    **I.**    **Nature and Circumstances of Mr. Peterson's Offense**

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained $1.4 million in property damage. Five individuals lost their lives.[15] And because of the breach, the 2020 Presidential Electoral College count was delayed. All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost friends, and some lost confidence in the American political system's ability to defend against threats to the peaceful transfer of power.

However, Mr. Peterson was not the cause of January 6, nor was he in the classification of people that caused physical harm to the Capitol or others. He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. There are a variety of factors that led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each

---

[15]    Ashli Babbitt was killed after she refused to comply with police commands. Kevin Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions while in the crowd. Rosanne Boyland was crushed to death. Officer Brian Sicknick died the day after, from injuries that appear related to his service on January 6. *See* Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

law enforcement agency."[16]  Additionally, the former president, the rally's organizers and speakers, and nefarious, organized groups contributed to the chaos.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs the Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

On January 6, Mr. Peterson, upon the urging of President Trump, traveled to Washington, D.C., to protest the results of the 2020 presidential election.  He rode to the nation's capital with his mother and wife from Pennsylvania.  After hearing the president's speech and heeding his call for supporters to "walk down Pennsylvania Avenue," Mr. Peterson marched with thousands of others to the Capitol building.  By the time he arrived, many of the outer barricades and bicycle racks used by officers to cordon off the Capitol grounds were displaced.  At approximately 2:23 p.m., Mr. Peterson walked through a previously breached door of the Capitol.

To be clear, Mr. Peterson played no role in organizing the January 6 rally, nor did he deliver inciting and aggressive commentary to the already energized crowd.  He urged no one to "kick[] ass," "go after [politicians]", "punch back from Donald Trump" or engage in "trial by combat."  Additionally, Mr. Peterson did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner doors or windows of the U.S. Capitol.  He did not damage or steal any property while inside.  He, at no time, assaulted or threatened law enforcement.  Instead, Mr. Peterson's offense conduct that day consisted of him

---

[16]     *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

unlawfully assembling at the U.S. Capitol, walking through an already breached door.

## II.     Mr. Peterson's History and Characteristics

Mr. Peterson is 35 years old and prior to 2020, he was resident of the state of California. He has never known his father. Mr. Peterson's mother was 17 years old at the time of his birth, therefore his maternal grandmother stepped in help raise him. *See* PSR ¶ 36 & ¶ 39, pg. 9. As a young child, Mr. Peterson's mother battled drug addiction and Mr. Peterson was placed into foster care. Thereafter, at the age of eight, Mr. Peterson's maternal grandmother adopted him. *Id*. Unfortunately, at the age of fourteen, Mr. Peterson's grandmother passed away and he was then placed back into foster care. *Id*. Mr. Peterson then did all he could to get out of the foster care system and was ultimately emancipated at the age of sixteen. Id.

Struggling with the loss of his grandmother, and facing the world as an adult at the age of sixteen, it is not surprising that he got involved in drugs. By his own account, Mr. Peterson claims this addiction began at the age of 17 which lasted until 2007. *See* PSR ¶ 48, pg. 10. Since meeting his wife Elizabeth and having her support, Mr. Peterson has been successful in battling his prior addictions. *See* PSR ¶ 41, pg. 10.

Six years ago, Mr. Peterson got married to Elizabeth and they have endured many hardships as a couple. *Id*. Despite those hardships, their relationship is a strong one and it has flourished along with their commitment to their faith. Mrs. Peterson is extremely supportive of her husband and respectfully submits in her letter to this Court that Mr. Peterson got "caught up in the momentum of the moment and made a poor choice." *See* Exhibit, Letters in support of Mr. Peterson, pg. 1.

Much has changed for the Peterson's since the pandemic. In 2020, Mr. Peterson lost his job and they could no longer afford living in California. *See* PSR ¶ 53, pg. 11. Mr. Peterson had

been in the restaurant industry as a self-made cook for the past seven years. The pandemic has had a devastating impact on the restaurant industry which had a dramatic impact on Mr. Peterson's jobs prospects. This impact led to Mr. Peterson and his wife moving across the country to the state of Pennsylvania to live with Mr. Peterson's mother. With thoughts of a more fiscally responsible environment, along with family as a source of support, Mr. Peterson is now an east coast resident. He is addressing his mental health needs and doing what he can in assisting his family, his faith community, and looking for work.

Mr. Peterson is extremely remorseful for his conduct inside the Capitol on January 6, 2021. He has been very ashamed of his behavior and wishes he could reverse time. In his letter to this Court, he accepts full responsibility for his actions and is prepared for the consequences of his actions. *See* Exhibit, Letter by Mr. Peterson to this Court.

### III. A Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Peterson to probation would not contribute to an unwarranted sentencing disparity, but sentencing him to *anything other* than probation, might. Though many of the January 6 cases are unresolved, the Court can look to other sentencing judgments to gain a baseline. January 6 defendants in other cases who pled to the *exact* same criminal charge have received probationary sentences. *See United States v. Anna Morgan-Lloyd*, Crim. No. 21-164 (RCL)(sentenced to 36 months probation); *United States v. Valerie Ehrke*, Crim. No. 21-097 (PLF)(36 months probation); *United States v. Danielle Doyle*, Crim. No. 21-324 (TNM)(2 months' probation); *United States v. Eliel Rosa*, Crim. No. 21-068 (TNM)(12 months probation); *United States v. Vinson, et al.*, Crim. No. 21-355 (RBW) (5 years probation); *United States v. Thomas Gallagher*, Crim. No. 21-041 (CJN)(2 years' probation); and *United States v. Douglas Sweet*, Crim. No. 21-041(CJN)(3 years' probation). Therefore, to sentence Mr. Peterson

9

differently than the above-mentioned January 6 defendants who pled to the same offense, would *lead to* an unwarranted sentencing disparity, in stark contrast to the factors dictated in 18 U.S.C. § 3553(a)(6).

## **CONCLUSION**

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person.  But Mr. Peterson, despite his presence within the crowd, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered.  He did not organize or incite the riot, nor did he physically harm any person or property.  And though Mr. Peterson certainly deserves some punishment for his conduct, it must be weighed against his lack of criminal history, his other history and characteristics, his individual actions on January 6, the non-incarceration sentences imposed on those who engaged in similar conduct, and his ability to timely pay restitution.  Considering these and other § 3553(a) sentencing factors, a one year term of probation, restitution in the amount of $500.00, and 40 hours of community service[17] is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Dani Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

---

[17] The probation office recommendation is also for a one year term of probation with 40 hours of community service, in addition to a restitution order for $500.00 and a special assessment of $10.00.  *See* ECF #25.