**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00309 (ABJ)** |
| **v.** | : | |
| | : | |
| **RUSSELL JAMES PETERSON,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth here, the government requests that this Court sentence Russell Peterson to two weeks incarceration and $500 in restitution.

### I.    Introduction

The defendant, Russell Peterson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

After repeating false claims about the 2020 election on Facebook, Peterson traveled to Washington D.C. with his wife and mother to attend the "Stop the Steal" rally. After the rally, the group of three followed the large crowd toward the Capitol building. When they realized pepper spray had been deployed, Peterson's wife and mother turned back and went to their car. Undeterred and now alone, Peterson continued further onto the restricted grounds of the Capitol building and eventually made it inside.

1

On his way into the building, Peterson stood mere feet away from rioters who were pushing and shoving law enforcement officers while aggressively yelling at them. But that didn't stop him either. After witnessing the violence, he continued on and entered the building through the Senate Wing Door, while people were climbing through broken windows on either side of him. Once inside the Capitol, Peterson pulled out his phone and began live-streaming to Facebook. He told his viewers "So we took the Capitol. The Capitol is ours right now." That wasn't the only time Peterson bragged about his exploits. Once he left, he told a Facebook user that he "stormed the castle broke into the chambers and smoked a blunt on the couch." He finished with "Overall I had fun lol"—demonstrating a callous disregard for the lives lost that day, the injuries suffered, and the harm to our democracy. And Peterson has still not shown any remorse. Instead, he's downplayed his crimes. Upon his arrest, he told the FBI he did not witness any violence at the Capitol, a claim that is directly contradicted by video evidence.

 Peterson pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. Peterson's conduct on January 6 took place in the context of a large and violent riot in which sheer numbers combined with violence to overwhelm law enforcement, allowing large numbers of rioters to breach the Capitol and disrupt the proceedings. The riot would not have been possible but for Peterson's actions and the actions of so many others. As explained below, a short custodial sentence is appropriate because of the violence that Peterson witnessed on January 6, his statements about it on Facebook, and his lack of remorse.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

A general summary of the facts surrounding the attack on the U.S. Capitol can be found in the Statement of Offense. *See* ECF 22 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop, we focus on Peterson's conduct and behavior on January 6 and the preceding months.

*Russell Peterson's Role in the January 6, 2021 Attack on the Capitol*

A.  Peterson Posts on Facebook Leading up to January 6

In the days and months following the 2020 Presidential election, Peterson frequently took to Facebook to voice his view that the election was fraudulent. For example:

- On November 30, 2020, Peterson commented on a post "Bring back public executions for Treason. This election was a Fraud!"

- On December 3, 2020 Peterson commented on a meme featuring a photo of President Biden and said "Fraud across the board."

- On December 4, 2020, Peterson replied to another Facebook user's comment and said "unfortunately Yes. The only way to restore balance and peace is through war. Too much Trust has been lost in our great nation."

- On December 13, 2020, Peterson said "Enact Martial Law Mr. President. Allow the citizens to make things right for our country since elected officials refuse too [sic]."

On December 31, 2020, Peterson replied to another Facebook user's comment saying that he will "personally be in DC January 6" and invited the user to join him.

    B.   <u>Peterson Attends the January 6 Riot, Enters the Capitol, and Live-Streams to Facebook</u>

On January 6, 2021, Peterson drove to Washington, D.C. from his home in Pennsylvania to attend the "Stop the Steal" rally with his wife and mother. Peterson wore a red facemask, a baseball cap, and a sweatshirt that said "Your Feelings" with a graphic meant to convey the expletive "F*** Your Feelings." The group of three posed for several pictures during the rally:







After the rally, Peterson, his mother, and wife, walked toward the Capitol grounds:



When the group got to the Capitol grounds and realized tear gas was being deployed, Peterson's mother and wife went back to their car. Peterson's wife has asthma and did not want to inhale any tear gas. Peterson, however, continued toward the Capitol building.

On his way into the building, Peterson witnessed multiple assaults on police officers who were trying to protect the Capitol that day. Body camera footage from around 2:00 p.m. shows Peterson standing just a couple feet away from rioters who had been violently shoving and pushing the officers moments before. **Exhibit A, Clip of Body-Worn Camera, 00:39-1:25**. The following screenshot shows a snapshot of the violence:



Sirens are blaring throughout the footage. Peterson first appears around the 1:08 mark of **Exhibit A**, standing just to the right of those who had been assaulting officers. He continued to watch as the rioters yelled at and berated the officers:



About a minute later, Peterson told officers "they want to defund you, we don't! we need you." **Exhibit B, Clip of Body-Worn Camera, 1:30; See also Exhibit A, 2:08**. Less than 20 seconds later, rioters try to take batons from the officers. **Exhibit B, 1:55.**

A third clip of body-worn camera, **Exhibit C**, shows that during this melee, a rioter was hitting officers with skateboard. **Exhibit C, Clip of Body-Worn Camera, 00:40-1:00**. Another video from an unknown source shows the scene from a different angle. **Exhibit D, Video Clip**. Peterson can be seen at the 00:30 mark:



Despite witnessing these acts of violence, Peterson continued into the Capitol building, entering through the Senate Wing Door around 2:23 p.m. Just ten minutes prior, rioters broke the

windows on either side of the door, becoming the first to enter the Capitol building. As Peterson

came in, other rioters continued to pour in through broken windows on either side of him:





For context, the Senate evacuation was underway, but the House had not been fully evacuated when Peterson entered the Capitol. While inside the Capitol, Peterson live-streamed two videos to Facebook. During the first live-stream, Peterson filmed fellow rioters in the Crypt as they chanted "Stop the steal! Stop the steal!" **Exhibit E, Peterson's First Facebook Live Stream, 00:07-09**. The scene depicted is one of chaos, with a large crowd of rioters moving frantically about the Crypt:



There is yelling and screaming in the background. **Exhibit E at 00:10-00:20.** At the end of the live-stream, Peterson said "So we took the Capitol. The Capitol is ours right now." **Exhibit E at 00:27-30.**

The police line protecting the Crypt and its many entrances and exits had fallen just four minutes prior to Peterson's video. In his second live stream, Peterson walks down a corridor near the Visitor's Center with other rioters:



A rioter walks by and says "we gotta f***ing charge the cops." **Exhibit F, Peterson's Second Facebook Live-Stream, 00:00-00:02**. While filming, Peterson says into his phone, "If you guys can't tell, there is tear gas in the air. They didn't stop us." **Exhibit F at 00:26-00:33**.

Peterson was also observed in the Crypt Lobby on CCTV footage:





Peterson left Washington D.C. around 4:00 p.m. and drove back to Pennsylvania with his mom and wife. Peterson's mom, Shelly, posted the following on Facebook:



C.     Peterson Brags About his Participation in the Riot

After the attack on the Capitol, Peterson bragged about his participation to a friend on Facebook while simultaneously promoting the false narrative that the election was fraudulent. On January 6, the Facebook user said, "You think Trump going to come out and be like yea that's my dogg." Peterson responded that same day, saying "No not for Trump my friend. Rules were changed before the election that went against the constitution of the United States. And has created uncertainty in the future of elections. I know the Government doesn't give too [sic] shits about me. I'm trying to change that. I stormed the castle broke into the chambers and smoked a blunt on the couch." The Facebook user responded, "Ahh ok. Keep smoking the. Keep the peace

bro. Don't be on no bullshit." Peterson replied, "I got mased, tear games [sic], and lumped up a lil bit. Overall I had fun lol."

### Peterson's Arrest and Interview

Peterson agreed to an interview with the FBI at the time of his arrest on February 12, 2021. Peterson admitted that he went to Washington D.C. with his wife and mother for what he called the "Patriot" rally and that he followed a group of "Patriots" to the Capitol. Peterson claimed he did not witness any violence, an obviously false statement in light of the videos and images detailed above.  He also explained that he did not sit in Nancy Pelosi's chair, and believes his mother must have misunderstood him when she posted that he did. The FBI did not find any video evidence that Peterson sat in Speaker Pelosi's chair.

Law enforcement also conducted a search of Peterson's house on the day of his arrest and found multiple weapons and ammunition. Peterson admitted that he owned a Smith & Wesson, Berretta, and an assault rifle that he said were heirlooms from his grandfather. Investigators also found the tan backpack Peterson was wearing in the photos outside the Capitol (though he appears to have taken it off before going inside). Inside the backpack, there was an axe and a knife. Since this evidence was collected over a month after January 6, it was not possible for investigators to discern whether Peterson took the axe and knife with him to Washington D.C.

### The Charges and Plea Agreement

On February 9, 2021, Peterson was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (2) and 40 U.S.C. §§ 5104(e)(2)(D), (G). On February 12, he was arrested at his home in Pennsylvania. On April 19, 2021, Peterson was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). September 8, 2021, he pled guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. §

5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. Peterson agreed to pay $500 in restitution to the Department of the Treasury.

### III.     Statutory Penalties

Peterson now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted in the plea agreement and by the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. Peterson must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a brief period of incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was occupied by hostile participants. By its very nature, the attack defies comparison to any other event.

15

While each defendant should be sentenced based on their individual conduct, each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Peterson also observed extensive fighting with law enforcement officials and saw chemical irritants being sprayed in the air. No rioter was a mere tourist that day. The collective whole was able to cause widespread destruction and delay the certification of the electoral college vote in part due to the participation of each rioter. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Even so, Peterson's conduct must be assessed on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of

16

violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Peterson traveled from Pennsylvania to D.C. to attend the "Stop the Steal" rally. He joined crowds of people who overwhelmed law enforcement both outside and inside the building. A crowd that ultimately shut down the Capitol for hours. He was not only in a position to observe the violence that happened outside the Capitol, he *did* observe it. Body camera confirms that he stood by and watched as rioters violently attacked police officers, shoving and pushing the officers as they yelled at and berated them. And yet, he didn't turn around and go back to his car. He kept going. Then, in his interview, he tried to downplay his involvement and outright lied, telling agents he did not witness any acts of violence on January 6.

In the pictures and videos from that day, Peterson did not seem concerned with the violence that he witnessed. He continued to watch the violence outside. He entered through a door that had been broken open ten minutes earlier as other rioters climbed through broken windows on either side. Any person would know at that point that their actions were wrong and harmful. Any reasonable person would have long-since gathered that the barriers were set up to show where the restricted grounds began, that the tear gas was not a welcome signal, and that the large group of people attacking officers was not an organized tour or peaceful protest. And Peterson walked deep into the building—eventually making it inside the Crypt shortly after the police line fell.

Then, Peterson initiated a live stream. He told whoever was watching his broadcast that "we took the Capitol. The Capitol is ours right now." His words elucidated his intentions that day. He went inside to help "take" the Capitol. Not to merely see what was going on. Not just to use the bathroom. To help his fellow rioters take control of the Capitol so that the election he

believed was fraudulent could not be certified. Peterson's live streaming to Facebook demonstrates that he wanted to share with others that the Capitol had been breached and that there were rioters inside. It would not be unreasonable to assume that these live streams could have encouraged others who may have been interested in joining the mayhem.

Though the PSR indicates that Peterson's wife said he regrets his participation in the offense, his statements immediately after the offense show otherwise. Bragging about "storm[ing] the castle" and "br[eaking] into the chambers" to "smoke a blunt on the couch" show a deep disrespect and disregard for our country, our democracy, and our political processes. Peterson didn't seem to regret a thing when he said, "Overall I had fun lol." By adding "lol" or "laugh out loud," Peterson displayed callousness toward a tragic event. Though not every factor listed above supports a sentence of incarceration, on balance, enough factors warrant a brief jail term. A sentence of probation or home confinement would be insufficient.

## B.  The History and Characteristics of the Defendant

As set forth in the PSR, Peterson's criminal history consists of misdemeanor controlled substance possession or use convictions. ECF 23 (PSR) ¶¶ 27-30. To his credit, Peterson has overcome a significant struggle with substance abuse. *Id*. ¶ 48. Peterson is currently unemployed but prior to the pandemic, he worked as a chef. *Id*. ¶¶ 53-55. Peterson appears to have been compliant with his conditions of pre-trial release. These factors weigh against a lengthy custodial sentence and in part contributed to the government's recommendation of two weeks' incarceration.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Peterson's actions and statements on social media clearly demonstrate the need for specific deterrence for this defendant. Peterson endorsed the events of January 6 by live-streaming them, and bragged about them to a friend afterward. All this despite having witnessed rioters violently attacking police officers, which he lied to the FBI about. Additionally, Peterson

has not expressed any remorse. Unlike other January 6 defendants who have been sentenced, Peterson's PSR is devoid of any statement from him expressing any regret or remorse. The only indication that he may regret his actions comes from his wife's statement. ECF. 23 (PSR) ¶ 35.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[3] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna*

---

[2] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr164 (RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-97 (PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165 (TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*Morgan-Lloyd*, 1:21-cr-164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-97 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low compared to those charged, the government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, like Peterson, deserve a sentence more in line with minor incarceration.

The government recommended a two-week sentence of incarceration in two other cases: *United States v. Scavo*, 21-cr-254 (RCL) and *United States v. Torrens*, 21-cr-204-002 (BAH). The facts in these cases may provide a useful reference point for the Court. Like Peterson, Scavo also filmed the events at the Capitol on his cellphone—recording similar boastful statements about taking the Capitol. *United States v. Scavo*, 21-cr-254 (RCL), ECF 37 (Government's Sentencing Memorandum). Scavo also witnessed assaults on Capitol Police officers. *Id*. Scavo does have additional aggravators in that he helped organized busses that brought more than 200 rioters to the rally and discussed the riot on local news, but Scavo also cooperated with the FBI more extensively than Peterson. *Id.* He agreed to two separate interviews before his arrest and voluntarily provided a thumb drive of video and photo evidence to the FBI. *Id.* Scavo also

expressed remorse in his PSR statement, unlike Peterson. Still, Judge Lamberth sentenced Scavo to 60 days of incarceration and a $5,000 fine.

In *United States v. Torrens*, the other case in which the government recommended two weeks of incarceration, Torrens saw rioters throwing things at law enforcement officers and spraying officers with pepper spray. 21-cr- 204-002 (BAH), ECF 99 (Government's Sentencing Memorandum). Torrens was not as close to the violence as Peterson, and unlike Peterson, Torrens demonstrated "what seems to be a heartfelt reflection and acknowledgment of his crime." *Id.* Like Peterson, Torrens also entered through the Senate Wing Door and made his way into the Crypt. *Id.* Chief Judge Howell sentenced Torrens to 90 days' home detention and 36 months' probation.[4]

There are several other misdemeanor cases in which rioters either directly witnessed or knew of violence occurring and received sentences of incarceration. *See e.g. United States v. Jancart*, 21-cr-148 (JEB) (45 days); *United States v. Rau*, 21-cr-467 (JEB) (45 days); *United States v. Hemenway*, 21-cr-049 (TSC) (45 days); *United States v. Bauer*, 21-cr-049 (TSC) (45 days); *United States v. Reeder*, 21-cr-166 (TFH) (3 months); *United States v. Camper*, 21-cr-325 (CKK) (60 days). Many on this list had additional aggravators not present in this case, which were reflected in higher sentencing recommendations by the government.

To be clear, the government is not alleging that Peterson assaulted any officers or even encouraged others to assault officers. The fact that Peterson closely witnessed violent acts and chose to enter the building afterward sets him apart from many other *misdemeanor* defendants.

---

[4]A period of probation after a term of incarceration may be appropriate in the defendant's case. The general prohibition against sentences that combine continuous incarceration and a term of probation, see 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, see 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009).

Specifically, it sets him apart from those who went into the Capitol but for which the government does not have evidence that they personally observed violence. Those who actually attacked law enforcement officers that day are charged with felony assault crimes. For example, Grady Owens, the individual who hit police officers with a skateboard while Peterson watched, is charged with a violation of 18 U.S.C. § 111(b), Assault with a Dangerous Weapon (among other charges).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Considering all of the applicable factors, the government believes a two-week term of incarceration and the agreed-upon $500 in restitution is appropriate here.

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Russell Peterson to a two-week term of incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

Matthew M. Graves
United States Attorney

By:      *s/Amanda Jawad*
Amanda Jawad
NY Bar No. 5141155
Assistant United States Attorney
District of Columbia Detailee
211 W. Fort Street
Detroit, MI 48226
(313) 226-9116
Amanda.Jawad@usdoj.gov

25