```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      ) Criminal Action
                                    ) No. 21-cr-309
4                    Plaintiff,     )
                                    ) SENTENCING
5    vs.                            )
                                    ) Washington, DC
6    Russell J. Peterson,           ) December 1, 2021
                                    ) Time:  9:30 a.m.
7                    Defendant.     )
     _____
8
                      TRANSCRIPT OF SENTENCING
9                        HELD BEFORE
           THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
     _____
11
                      A P P E A R A N C E S
12
     For Plaintiff:         Amanda Jawad
13                          DOJ-USAO
                            211 W. Fort Street, Suite 2001
14                          Detroit, MI  48226
                            (313) 226-9116
15
     For Defendant:         Danielle Jahn
16                          Assistant Federal Public Defender
                            625 Indiana Avenue, N.W., Suite 550
17                          Washington, DC  20004
                            (202) 208-7500
18

19   _____

     Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
20                          Official Court Reporter
                            United States Courthouse, Room 6523
21                          333 Constitution Avenue, NW
                            Washington, DC  20001
22                          202-354-3267

23

24

25
```

 1              THE COURTROOM DEPUTY:  Your Honor, this morning, this

 2    is a video sentencing proceeding.  We have criminal case number

 3    21-309, the *United States of America V. Russell James Peterson*.

 4    The defendant is present by video.

 5              Will the probation officer please identify herself

 6    for the record.

 7              THE PROBATION OFFICER:  Carmen Newton from the

 8    probation office.

 9              THE COURT:  Good morning.

10              THE COURTROOM DEPUTY:  Counsel for the government.

11              MS. JAWAD:  Good morning, Your Honor.  Amanda Jawad

12    on behalf of the United States.

13              THE COURT:  Good morning.

14              THE COURTROOM DEPUTY:  Counsel for the defendant.

15              MS. JAHN:  Good morning, Your Honor.  Dani Jahn on

16    behalf of Mr. Peterson.

17              THE COURTROOM DEPUTY:  And will Mr. Peterson please

18    state his name for the record and verify that he is able to

19    both see and hear the judge and the attorneys.

20              THE DEFENDANT:  Russell James Peterson.  And, yes,

21    sir, I can both see and hear the judge.

22              THE COURT:  All right.  We're here this morning for

23    Mr. Peterson's sentencing.  I would like to note that, for any

24    members of the press or public who are listening in on the

25    public line, you have an absolute right to attend and report on

1    what transpired during court proceedings, but the recording or

2    dissemination of a recording of these proceedings would be a

3    violation of our local court rules.

4           I also, before we begin, want to make sure, Ms. Jahn,

5    that you've consulted with the defendant about whether he

6    wishes to proceed by video conference today.

7           MS. JAHN:  I have, Your Honor.  In light of the CARES

8    Act and pandemic, Mr. Peterson agrees to appear in this manner.

9           THE COURT:  All right.  Mr. Peterson, is that

10   correct?  Do you agree to proceed by video conference today?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  All right.  I find, pursuant to the CARES

13   Act, given the defendant's waiver and the standing orders of

14   this court calling for remote proceedings whenever possible to

15   protect the health and safety not only of the court personnel,

16   but of the defendant himself and the lawyers involved, that

17   these are specific reasons why the sentencing in this case

18   cannot be further delayed without serious harms to the interest

19   of justice and we should go forwards in this fashion.

20          The final presentence report was filed in this case

21   on November 18th, 2021.  Has both the defendant and the defense

22   counsel had an opportunity to review it?

23          MS. JAHN:  We have, Your Honor.

24          THE COURT:  And as I understand it, I don't believe

25   there are any factual or legal disputes to be resolved at this

1 point?

2     MS. JAHN:  That's correct, Your Honor.

3     THE COURT:  So I'm going to accept the presentence

4 report as undisputed and as findings of fact underlying the

5 sentencing.

6     I've also received additional materials concerning

7 the defendant, including the government's memorandum in aid of

8 sentencing, the defendant's memorandum in aid of sentencing and

9 a number of attachments, including a letter from Elizabeth

10 Peterson, the defendant's wife; Patricia Jensen, a friend he

11 helped rescue at a time of crisis in her life; Vince White, a

12 friend who met the defendant through the defendant's mother; a

13 gentleman who is suffering from MS and defendant's wife is his

14 caregiver, but he detailed how much he depends on the

15 defendant's voluntary support, as well, and; I also received a

16 letter from the defendant himself.  And I wanted to note that

17 I've read and appreciated all of that material.

18     In a criminal case there's a statute that tells me

19 how I'm supposed to go about deciding what the sentence should

20 be, it's 18 U.S. Code § 3553.  It list a number of important

21 factors, all of which I'm going to discuss.  And ordinarily the

22 advisory sentencing guidelines are one of the factors that I

23 have to consider in determining an appropriate sentence.

24 However, given the plea to the misdemeanor charge of parading,

25 demonstrating, or picketing in a Capitol building, in violation

1    of 40 U.S. Code § 5014(e)(2)(G), which is a Class B

2    misdemeanor, the sentencing guidelines don't apply and don't

3    factor into the determination at all.  The statute provides for

4    a maximum sentence of up to six months.  And that's the legal

5    backdrop for what we're doing today.

6          Would the government like an opportunity to speak

7    regarding the appropriate sentence in this case?

8          MS. JAWAD:  Yes, Your Honor.

9          THE COURT:  All right.  Go ahead.

10         MS. JAWAD:  Thank you, Your Honor.  At this point the

11   Court is well aware just how serious what transpired on January

12   6th was.  It would not be an understatement to say that what

13   happened was a serious threat to our democracy, to the very

14   core of our nation's existence.

15         The case is unprecedented in so many ways; in part,

16   it's because we have a situation where the individual conduct

17   of hundreds, if not thousands of people, combined together to

18   create one of the most serious crimes in our nation's history.

19         So the question becomes:  How do we hold each

20   individual responsible for their actions that day, when we know

21   that the combination of all of these actions resulted in such a

22   serious crime.  And the government believes it's important to

23   look to the individual factors of what each defendant did that

24   day to determine where Mr. Peterson falls on the spectrum of

25   people who have already been charged and sentenced for their

1    conduct.

2            So I would like to go through some of the things that

3    make Mr. Peterson's circumstances aggravating, starting with

4    his social media posts.  Mr. Peterson posted, before the events

5    of January 6th, that he believed the election was a fraud.  He

6    called for -- or, to set our country right, he mentioned

7    bringing back public executions for treason.  A lot of this

8    inflammatory language was connected to posts relating to his

9    disappointment with the election that he believed was a fraud.

10           Then when we move to the events of January 6, perhaps

11   the most aggravating factor in this case is that Mr. Peterson

12   was present only a few feet away from some of the violence that

13   occurred outside the Capitol.  The government provided several

14   videos to the Court showing Mr. Peterson witnessing violent

15   shoving.  He also was right next to Grady Owens, who was

16   hitting law enforcement officers with a skateboard.  And so

17   Mr. Peterson was very well aware that this wasn't just a

18   protest, it was something that had turned into violent acts

19   that were very threatening to law enforcement.

20           And we're not alleging that Mr. Peterson encouraged

21   the violence.  He, himself, was talking to law enforcement and

22   saying that we need law enforcement.  It's not really clear if

23   he was trying to diffuse the situation or not.  But our point

24   is that he saw the violence happening and he didn't turn around

25   to go home, he actually went further into the Capitol.  So he

1    knew what a violent and destructive day that was already and

2    decided to go inside.  And he went inside within ten minutes of

3    the initial breach of the Senate wing door.  So he was part of

4    the first ten minutes of people that were pouring into the

5    Capitol and disrupting the proceedings.

6            He also livestreamed from inside the Capitol, said

7    that, "We took the Capitol."  I think that word is important

8    because it shows that his intention was there to be part of the

9    crowd that took over and prevented the certification of the

10   Electoral College vote.

11           Mr. Peterson's statements after that day also

12   demonstrate that he didn't really regard this as a serious,

13   tragic event.  He said he had fun, LOL; laughed about it.  And

14   this was a serious stain on our country's democracy, and

15   clearly he didn't recognize that at the time.  He bragged about

16   smoking marijuana inside the Capitol.

17           So, if you look at these circumstances, compared to

18   the other defendants that have been sentenced, Mr. Peterson is

19   not the most egregious offender, that is something that the

20   government can acknowledge; he wasn't wearing tactical gear,

21   preparing for violence, he didn't break or hurt anyone --

22   although if he did, he would have been charged with a felony.

23   So that's maybe not the most useful comparator in a misdemeanor

24   case.  But he didn't use threatening language, he didn't have a

25   dangerous criminal history, he didn't destroy evidence, as far

1   as we're aware.

2         So, again, he falls on the lower level of the cases

3   which the government has recommended a sentence of

4   incarceration, and that's why our sentence is a shorter

5   sentence -- recommendation of incarceration.  Although we do

6   recognize that any sentence of incarceration is a serious

7   matter that is taken seriously in this case.

8         And there are also defendants who did much less than

9   Mr. Peterson, and many of those defendants were sentenced to

10  probation.  For example, some people just entered for only a

11  few minutes, some people entered for less than one minute.

12  That's not the case with Mr. Peterson.  There are also

13  individuals who weren't posting on social media, who showed

14  extensive remorse and cooperation, who, you know, voluntarily

15  provided things to the FBI.

16        And I also think it's important to note, Your Honor,

17  that he was not entirely truthful in his interview with the

18  FBI.  He said that he didn't witness any violence at the

19  Capitol.  And as Your Honor saw in the video evidence, it's

20  clear that he did.  So, not only was he not actively providing

21  evidence and cooperating with the FBI, he was also untruthful

22  when he did interview with the FBI.

23        And the last thing I want to point out, Your Honor,

24  is a case that is not in the government's sentencing memorandum

25  but I was reviewing it this morning and thought it might be a

1    useful comparator, and that's *United States v. Bissey*, where a

2    Capitol rioter was sentenced to two weeks of incarceration.

3    She also saw people pushing through fencing, similar to

4    Mr. Peterson.  She also made some Facebook statements.  She was

5    inside for a shorter time than Mr. Peterson, but she was

6    sentenced to a two-week term of incarceration.

7            So, the government considered all of these factors in

8    weighing Mr. Peterson's culpability and where he falls on the

9    scale, and we believe a two-week sentence of incarceration is

10   appropriate here.  Thank you, Your Honor.

11           THE COURT:  Thank you.  Ms. Jahn, would you like to

12   speak on the defendant's behalf?

13           MS. JAHN:  Yes, Your Honor.  And just to inquire, you

14   had issued a minute order asking for supplements by the parties

15   with regard to home confinement, and I just want to be certain

16   that you had a chance to review those, as you did not indicate

17   that you reviewed them when you were going through what you had

18   read.

19           THE COURT:  I apologize, that should have been on the

20   list of things that I received.  And I did read both of them

21   and I don't think there's a difference in position between the

22   parties, that if a sentence of probation was ordered, that home

23   detention could be a condition of that probation for a limited

24   period of time.  But I wanted to make sure, because there were

25   different things said in the original pleadings about that

1    subject.  But, yes, thank you for reminding me.  I did review

2    both of those.

3                MS. JAHN:  Very well, Your Honor.  And just so the

4    Court also knows, the issues about confinement and terms of

5    probation were briefed extensively before the Chief Judge in

6    the matter of *Torrens*, T-O-R-R-E-N-S.  Both of the parties

7    cited to that case in the supplement.  And, obviously, you can

8    see that the Chief Judge imposed a probationary sentence, with

9    electronic monitoring of 90 days.

10               And so I just want to be clear that the issues about

11   whether jail in addition to probation is a contested one, I

12   believe -- I was not counsel in the *Torrens* case, but I believe

13   that the Chief said otherwise, and had said it is not

14   appropriate, which is inconsistent with what the government put

15   forward in their supplemental sentencing memorandum, and then

16   also suggested that intermittent confinement could work,

17   although they are not seeking it at this time.  So I just want

18   the record --

19               THE COURT:  Well, and I understand that and --

20               MS. JAHN:  I'm sorry.

21               THE COURT:  -- after I issued the minute order I went

22   to the Chief Judge's judgment and commitment order.  So I was

23   able to see that while there was a home confinement and

24   probation, that it was a condition of probation, it wasn't

25   successive.  And I agree with you, that under this statute --

1    and, actually, it's one of my biggest frustrations with the

2    particular misdemeanor that was chosen.  I don't disagree at

3    all with the prosecutorial judgment, that a lot of these

4    individuals should have been charged with a misdemeanor or

5    permitted to plead to a misdemeanor.  The selection of this one

6    takes a very useful sentencing arrow out of our quiver because

7    there are people who might benefit from some of the supervision

8    that a good probation office could provide in the vocational

9    training, or substance abuse testing or treatment, or mental

10   health treatment, or a lot of things.  I'm not talking about

11   the defendant in particular right now, I'm talking about them

12   as a group.  And the Court has a binary choice, even between a

13   short-term of incarceration and some of those services.  And

14   it's a frustrating aspect of the Class B misdemeanor situation

15   that we're feeing.  But I agree with you, Ms. Jahn, that you

16   can't do both.

17           MS. JAHN:  Very well, Your Honor.  And, so, I think

18   in terms of where we are, we're not far apart.  And you've read

19   all of the briefing, so I'm not going to belabor it.  But I

20   just want to highlight a couple of things that the government

21   seems to point out.  And one of which is that there's a

22   suggestion that Mr. Peterson's voluntary discussions with the

23   FBI, that he was untruthful.  And we just take a position with

24   that.  Mr. Peterson's legal understanding of how lawyers

25   classify crimes as crimes of violence is separate and apart

1    from Mr. Peterson being truthful.  Shoving a police officer, to

2    a layperson, perhaps, might suggest that that is not violent

3    conduct.  Mr. Peterson has done nothing but been forthright and

4    admitted to his role and his conduct in this case from the very

5    beginning, as he was one of the first individuals charged with

6    offenses from January 6th.

7         As you know, February is when his path began in the

8    criminal justice system, and he is just one of just a few dozen

9    now that have been able to resolve their cases, and has pushed

10   through trying to resolve it, notwithstanding all the other

11   issues that have happened in the past many months.

12        So we would respectfully submit that Mr. Peterson was

13   truthful to the FBI.  And he has been remorseful for his

14   conduct.  As he outlined in his letter to you, Your Honor, he

15   has realized that social media is not a platform in which he

16   wants to continue pursuing any comments about his life, nor

17   anyone else's.  I think everyone connected to this video

18   conference hearing can attest that social media played a huge

19   role in the events of January 6th, from people that are not

20   members of this criminal case but are elected officials, to

21   those such as Mr. Peterson.  And so Mr. Peterson has opined

22   that he wants to refrain and do away with any contact with

23   social media, which I think is something to be commended.

24        He has had a very challenging time trying to deal

25   with his actions on that day and why he posted certain things

1    the day of.  He is shameful of his behavior and has been very

2    remorseful.  He has tried to resolve this case as quickly as

3    possible.

4          He has had a very tumultuous upbringing, as you read

5    about in the sentencing memos.  He has worked hard to overcome

6    his addiction.  He has worked hard to move across country to

7    have the support of family on the East Coast.  He has worked

8    hard to try to obtain employment during a pandemic, when his

9    skill set is connected to the restaurant industry, which has

10   been decimated by the pandemic.  This is a person who has

11   struggled, and he will continue to struggle, despite what

12   conditions this Court imposes.

13         But we respectfully submit, given his background, his

14   very limited roles on the events of January 6 that day and his

15   remorse, that a one-year term of probation, with 40 hours of

16   community service and a $500 restitution order, in addition to

17   the special assessment of $10, he be sentenced to those terms,

18   Your Honor.

19         THE COURT:  All right.  Well, your sentencing memo

20   included a very powerful and heavily footnoted account of the

21   statements made by the former President as early as December

22   2020, and those made by many of the speakers, including members

23   of Congress, the former President and his family members at the

24   rally on January 6th.  You never tie any of that specifically

25   to your client, so I just want to make sure I understand what

1     are you telling me, and what was the point of that portion of

2     your memo?

3              MS. JAHN:  Your Honor, the point of that is that you

4     have these other persons who are not charged with criminal

5     conduct who fueled the fire, if you will, to many people,

6     including Mr. Peterson.  And so, we need to start the

7     conversation at that point.  We need to start the conversation

8     with what led all of these people, including Mr. Peterson, to

9     arrive at a peaceful protest, to then lead to the events of

10    January 6, at around 2:23 in the afternoon.

11             And so I think it's important to start the story,

12    frankly, where it begins, and Mr. Peterson's role in that

13    context.  And particularly so because the government has said

14    that Mr. Peterson played no role in violence, he played no role

15    in anything but, frankly, positive responses to law

16    enforcement.  And so I think it's important to assess what

17    other people said and what other people's posts were made on

18    social media in the context of Mr. Peterson and his individual

19    role in this particular instance.

20             THE COURT:  All right.  And what I am supposed to

21    make of the contrast between a lot of the information about his

22    sobriety and consistency with that and his bragging about

23    smoking a blunt in the Capitol?

24             MS. JAHN:  So, Your Honor, as the government knows --

25    you may not, but I think you viewed all the videos -- he did

1    not smoke a blunt in the Capitol.  And this is just another

2    example of many persons, including the former President of the

3    United States, would make statements on social media that were

4    not accurate.  And that is also one of the components that

5    Mr. Peterson has grappled with about his behaviors and why he

6    would write such a statement on a social media platform that

7    was not accurate.  We don't dispute that, but there's no

8    evidence that that was performed.

9              THE COURT:  All right.  I don't think I interrupted

10   you, but if there was anything else you wanted to say, I want

11   to give you the chance to say that.

12             MS. JAHN:  Thank you, Your Honor.  We just rest on

13   our submission.

14             THE COURT:  Okay.  Mr. Peterson, as I said, I read

15   your letter, but this is your opportunity, if you would like,

16   to say anything that you want me to consider before I impose

17   sentence in your case.

18             THE DEFENDANT:  I would just like to say I'm sorry

19   and I -- I want to bear my cross and pay for my debt.

20             THE COURT:  All right.

21             THE DEFENDANT:  That's pretty much it, ma'am.

22             THE COURT:  Okay.  I think what I want to do is take

23   a very brief break, just to absorb everything that was just

24   said and gather my thoughts before I impose sentence in this

25   case.  I would request that everybody just stay connected so

1      that we don't lose you and everybody doesn't have to dial in

2      again.  I don't think it's going to be much more than about

3      five or so minutes.

4              So, just going to excuse myself and I'll be back in

5      about five minutes.

6              (Recess.)

7              THE COURTROOM DEPUTY:  Your Honor, recalling criminal

8      case No. 21-309, *United States of America versus Russell James*

9      *Peterson*.  This is a video sentencing proceeding.  Mr. Peterson

10     is present by video.  Counsel for the defendant is Ms. Jawad.

11     Counsel for the defense is Ms. Jahn.  The probation officer is

12     Officer Newton.

13             THE COURT:  All right.  Every one of the defendants

14     in these cases is different and every sentence needs to be

15     considered individually, notwithstanding the number of cases or

16     the fact that it was a large group that entered the Capitol.

17     Sentencing, the fact that it is individual is fundamental.  And

18     actually, I have found this case to be one of the more

19     difficult ones in my caseload, and so the only way to deal with

20     this is to go through the statutory sentencing factors one by

21     one in some detail because they point in various directions.

22             First thing I'm supposed to think about is the nature

23     and circumstances of the offense.  What did you do?  You did

24     not end up in the Capitol by mistake.  You were not simply

25     swept along by events.  There's no ambiguity about why you were

1    there.  Your own statements provide the context for the acts

2    described in the statement of offense.  It's true that you

3    didn't write the post, "Bring back public executions for

4    treason.  This election was a fraud."  That was a post you

5    commented on in November.  Similarly, in December you commented

6    on something that someone else posted that said, "Fraud

7    across the board."  I understand the difference.

8           However, on December 4th you replied to another

9    Facebook user's comment and said, in your words,

10   "Unfortunately, yes, the only way to restore balance and peace

11   is through war.  Too much trust has been lost in our great

12   nation."  And on December 13th of 2020 you said, "Enact martial

13   law, Mr. President.  Allow the citizens to make things right

14   for our country, since elected officials refuse to."  And on

15   December 31st of 2020 you replied to another Facebook user's

16   comment, saying that you were personally going to be there on

17   January 6 and you invited the user to join you.  Then you got

18   here.

19          The U.S. Capitol was closed to the public while, in

20   accordance with the U.S. Constitution, a joint session of

21   congress was convened to certify the vote of the Electoral

22   College in the 2020 presidential election.  Vice President Mike

23   Pence, a Republican, was present and presiding, as the

24   Constitution required him to do.  The U.S. Capitol police

25   officers, federal law enforcement officers, doing their jobs

1    surrounding the building, were overcome.

2         You were one of the many individuals who made their

3    way past the officers, who were attempting to keep the crowd

4    away, and into the building.  The government introduced

5    evidence to show me that you stood close to and could not

6    possibly have missed the rioters who were pushing and shoving

7    officers, yelling at them, and even attacking them.  To your

8    credit, you were not one of them, and you did say positive

9    things to the police officers.  But that was not enough to

10   deter you.  And I think you somewhat sugarcoated things when

11   you talked to the FBI about what you had seen that had

12   happened.

13        But most important, you were one of the individuals

14   who entered the closed building.  Yes, you gained access

15   through a door that had been opened by that point, but it was

16   flanked on either side by broken windows that others were using

17   at the same time.  And so you knew you were entering a building

18   where you weren't supposed to be.  And the certification

19   process that was going on was, indeed, interrupted as members

20   of Congress and the Vice President had to be spirited to safety

21   or were forced to hide.  That was the point of your trip; to

22   get inside, to disrupt the process.

23        Once you got inside, you began livestreaming on

24   Facebook yourself.  "So we took the Capitol.  The Capitol is

25   ours right now."  Entry was mission accomplished, as far as you

1    were concerned.  It is also a significant aspect of the nature

2    and circumstances of the offense that you didn't destroy

3    anything or hurt anyone once you got inside, and the sentence

4    has to reflect that as well.  It's essential to differentiate

5    you from those involved in threatening or taunting public

6    officials and assaulting police officers.

7            However, after you left you were still not chastened

8    and you essentially bragged about it.  You said you'd "stormed

9    the castle, broke into chambers, and smoked a blunt on the

10   couch.  Overall I had fun.  LOL."

11           I have to tell you, it is your remarks that have

12   caused me to think long and hard about this sentencing and have

13   made it extraordinarily difficult to arrive at the conclusion

14   that probation would be an adequate response.  The "LOL"

15   particularly stuck in my craw because, as I hope you've come to

16   understand, nothing about January 6 was funny.

17           Hundreds of police officers were injured, people lost

18   their lives, the building was defiled, personal property was

19   stolen, public property was damaged, there were threats to kill

20   public officials ranging from Nancy Pelosi to Mike Pence.  No

21   one locked in a room, cowering under a table for hours was

22   laughing.  And the process necessary to complete a democratic

23   election, the process necessary to ensure that the thing that's

24   supposed to be the singular defining element of our form of

25   government -- the peaceful transfer of power -- was not only

1    threatened, but it was actually stopped for hours.

2         You wrote to me and you said we're the leaders of the

3    free world and we should never compromise that because of

4    politics, and you're right about that.  We're supposed to be

5    inspiring democracy abroad, yet hundreds, including you, tried

6    to bring it down from within, right here in our nation's

7    capital, under the dome of the Capitol building itself.  It was

8    sickening, it was horrifying, and it was utterly inconsistent

9    with what this country stands for.  And I'm concerned that

10   there's an ongoing harm to what our democracy is supposed to

11   be, and that we don't know if it's irreparable or not because

12   we really don't know yet if things will return to the way they

13   were or if a disorderly, violent reaction to elections is now

14   an acceptable option to a large segment of the population.

15        I guess the only good thing about the "LOL" comment

16   is that at that point you were being a goof and you weren't

17   talking about war anymore.  But the nature and circumstance of

18   the offense are quite troubling.

19        I have to look at you as an individual, as I said.

20   And you didn't come to D.C. just to attend a rally.  Your own

21   wife and mother managed to do just that without going to the

22   Capitol.  You didn't just exercise your First Amendment rights,

23   you made a choice, you broke the law.  You're not here today

24   because you supported the former President; millions of people

25   voted for him and didn't heed his call to descend on

1   Washington.  You were convicted because you were an

2   enthusiastic participant in an effort to undo the electoral

3   process, to subvert democracy, which is based on the will of

4   the people, and replace it with the will of the mob.  You may

5   well have sincerely believed that the election had been unfair

6   and tainted, but that belief was misguided and there was no

7   evidence behind those claims.  And you did receive a lot of

8   overwhelming, inaccurate information on social media, but you

9   had a choice to reject the lies and not to join the

10  antidemocratic call for martial law.

11          Mr. Peterson, you tell me you're a true independent,

12  and I'm sure you're sincere about that.  And I want to assure

13  you that you did and you still do have an absolute right to

14  support whoever you want to support, to rally for whoever

15  inspires you, to vote for whoever you choose.  But so does

16  everyone else.  Your voice doesn't count more than anyone

17  else's.  You don't get to cancel them out, call for a war

18  because you don't like how the election turned out.

19          I agree with the other judges in this courthouse who

20  have observed that these are grave offenses, not just against

21  the members of Congress, the guards, or government property --

22  any of which alone would be extremely significant and would

23  warrant some punishment -- but this was a crime against

24  democracy itself.  Your conduct violated the very principles

25  and institutions that the flag that was sewn on your hat was

1   supposed to represent, and that you wrote about in your letter.

2          I reject the notion in the sentencing memo that any

3   lack of preparedness or errors of commission or omission that

4   left the Capitol inadequately protected is a mitigating factor

5   in any way.  While those who left the building vulnerable need

6   to answer for their actions and we need to get to the bottom of

7   what happened so it can't happen again, there would not have

8   been a breach if people, lots of people, weren't trying to

9   break in.

10          And as for the incendiary statements at the rally

11  detailed in the sentencing memo, which absolutely, quite

12  clearly and deliberately, stoked the flames of fear and

13  discontent and explicitly encouraged those at the rally to go

14  to the Capitol and fight for one reason and one reason only, to

15  make sure the certification did not happen, those may be a

16  reason for what happened, they may have inspired what happened,

17  but they are not an excuse or justification.

18          No one was swept away to the Capitol.  No one was

19  carried.  The rioters were adults.  And this defendant, like

20  hundreds of others, walked there on his own two feet and he

21  bears responsibility for his own actions.  There may be others

22  who bear greater responsibility and who also must be held

23  accountable, but this is not their day in court, it is yours.

24          That being said, January 6th is not the only thing

25  there is to know about you, and the law also requires me to

1    consider the history and characteristics of the defendant.  I

2    found the description of your life and what you've managed to

3    overcome, pretty much entirely on your own, to be extremely

4    moving.  To say that you lacked advantages when you were

5    growing up would be a gross understatement.  Given the absence

6    of your father and your mother's inability to deal with her own

7    addiction at that time -- which now, as an adult, I think you

8    can understand how difficult it was for her -- you ended up in

9    foster care at a young age.  And I have to tell you, your

10   description to the probation officer of what that means will

11   ring in my ears forever.

12         You had a grandmother who loved you and was able to

13   step up, but her untimely death put you back in that system.

14   And you were still a child when you successfully fought for

15   your own emancipation, achieved at age 16.  Essentially you

16   raised yourself.  And it wasn't a smooth road.  Unsurprisingly,

17   you had substance abuse issues of your own and you had no one

18   there to insist that you'd actually benefit from completing

19   high school.

20         But meeting Elizabeth changed your life and you not

21   only achieved, but have maintain sobriety ever since.  That is

22   not an easy thing to do, Mr. Peterson, and you deserve great

23   credit for it.  Other than the offenses involving possession

24   from that period of time when you were using and the offense

25   that brought you here, you've had no involvement with the

1    criminal justice system whatsoever.

2         The letter reflects that you are and have been and

3    can be a serious person and that you are a very decent person,

4    worthy of respect and compassion.  And I want you to understand

5    that nothing I do or say today diminishes or denies that in any

6    way.  It is not my job to judge you as a human being, but it is

7    my role to determine what is the appropriate consequence for

8    specific conduct on a specific day.

9         You have a record of trying to be productive in an

10   economy where that's difficult.  You trained yourself from your

11   start as a dishwasher to be a chef and then, tragically, lost

12   that opportunity when COVID closed the restaurant doors.  The

13   road has not been easy, but you have not given up your hope and

14   faith, and that all says a lot about you.  You also haven't

15   stopped helping others along the way, which also says a lot

16   about you and what you value.  Mr. White's letter of full of

17   the details of how you help him every day.

18        It's also important that you pled guilty and accepted

19   responsibility for your actions that day.  You wrote me a

20   sincere letter, showing me that you thought a lot about this

21   and you've learned something, and I have to factor that in as

22   well.  I can't say that about everyone who comes before this

23   Court.  You would be shocked at how many people don't bother to

24   think about what they did and tell me what they think.  And you

25   certainly can't say that about everyone who was involved or

1   affected by January 6th.  A lot of people haven't learned

2   anything.  So there's that.

3           The Court is also required to impose a sentence

4   that's sufficient but not greater than necessary to accomplish

5   the purposes that are set out in the statute.  And a number of

6   them point in different directions, but what I am supposed to

7   think about, according to the law, is the need to reflect the

8   seriousness of the offense, to promote respect for the law, and

9   to provide just punishment for the offense.

10          I'm also supposed to afford adequate deterrence to

11  criminal conduct.  And that means to deter you from doing it

12  again and to deter other people from doing something similar.

13  I'm supposed to think about whether I need to protect the

14  public from further crimes committed by you, and what I could

15  do to provide you with educational, vocational training or

16  medical care or other treatment in the most effective means.

17  And as I said, some of those point in different directions.

18          I'm also supposed to think about the need to avoid

19  unwarranted sentencing disparities among defendants with

20  similar records who have been found guilty of similar conduct.

21  And basically that means I'm supposed to try to make your

22  sentence fair when I compare it to sentences that other people

23  got for doing something similar.  And usually the sentencing

24  guidelines are supposed to serve that function, but they have

25  limited utility here.

1          Also, ensuring that your sentence fairly reflects

2     where you fall on the spectrum of people arrested in connection

3     with January 6 was largely accomplished by the offer of the

4     misdemeanor plea, which reduces your exposure substantially.

5     And I agree with the other judges who have said that even if it

6     is a misdemeanor, probation isn't necessarily the going-in

7     assumption.

8          The government reviewed a number of factors and took

9     the position that you were someone for whom a very short

10    sentence would be sufficient.  And that's telling about where

11    you fall on the spectrum, as they know the facts of more cases

12    than I do.  I have to say that my instincts would say that a

13    good bit more than two weeks -- frankly, even anywhere from 30

14    to 60 to 90 days or more -- would be a fair response to the

15    offense and would fall well within the category of just

16    punishment and reflecting the seriousness of what took place.

17         But looking at the other factors, I'm not concerned

18    right now that the community needs to be protected from you,

19    nor am I concerned that there is much more to be done to deter

20    you from doing something similar again.  I think you've learned

21    a lot.  But I can't overlook the fact that I need to deter not

22    only you, but others from doing similar things in the future.

23         And as I said before, while it would be beneficial to

24    have some oversight to help you with job training or job

25    placement, there's really little in the way of the kind of

1    treatment that a probation office can provide that you need;

2    you've done a tremendous amount yourself in terms of dealing

3    with substance issues and everything else.  And it does strike

4    me that while the people in the restaurant industry were among

5    the first and hardest hit in the pandemic, they are also the

6    ones who are in demand right now as restaurants are putting

7    Help Wanted signs up all over.  And so, hopefully, you will

8    have opportunities in this job market that maybe someone

9    without your training might not.

10           The sentencing statute also tells me to consider the

11   need to provide restitution to any victims of the offense.  And

12   here it is agreed that you will pay some part of the damages in

13   this case, and $500 will be paid back for the damage that was

14   done to the building that day.

15           So, therefore, after considering all the statutory

16   factors, in an exercise of my discretion, the sentence to be

17   imposed it as follows:  It's the judgment of the Court that you

18   are hereby sentenced to a period of 30 days incarceration on

19   Count 4.  You will be permitted to voluntarily report at the

20   time you are designated.  You've abided by every condition of

21   release to date.

22           I find that you do not have the ability to pay a fine

23   and had, therefore, waive the imposition of the fine.

24           You are required to pay a $10 special assessment to

25   the court.  It's immediately payable to the Clerk of the Court

1   for the U.S. District Court of the District of Columbia.  If

2   you change your address before that's been paid in full, you

3   have to notify the Clerk of the Court of the change in your

4   address.

5           Pursuant to the plea agreement, you are hereby

6   ordered to pay $500 restitution towards the more than one and a

7   half million dollars worth of damage to the U.S. Capitol that

8   day.

9           Mr. Peterson, you have a right to appeal the sentence

10  I imposed if it's longer than the statutory maximum.  If you

11  choose to appeal, you must file any appeal within 14 days after

12  the Court enters judgment.  If you're unable to afford the cost

13  of an appeal, you may request permission from the Court to file

14  an appeal without cost to you.

15          I believe right now there are other charges that need

16  to be dismissed.

17          MS. JAWAD:  Yes, Your Honor.  The government moves --

18  I'm sorry.  We move to dismiss Counts 1 through 3 of the

19  information.

20          THE COURT:  All right.  That motion will be granted.

21          Is there anything further I need to take up on behalf

22  of the government?

23          MS. JAWAD:  No, Your Honor.  Thank you.

24          THE COURT:  Ms. Jahn, anything further on behalf of

25  the defendant?

1          MS. JAHN:  Yes, Your Honor.  In light of the decision

2     to have him serve 30 days incarceration, would you allow for a

3     report date after the holidays, the date of January 3rd?

4          THE COURT:  Did you say 1st or 3rd?  What was the

5     date?

6          MS. JAHN:  After the -- so, to report no earlier than

7     January 3rd, which is the first Monday after the holidays, Your

8     Honor.

9          THE COURT:  Yes.  I will make that part of the

10    judgment and commitment order.

11          All right.  Ms. Jahn and Ms. Jawad, I really

12    appreciated the quality of the sentencing memoranda in this

13    case and I took it all very seriously and I think everybody did

14    a very good job.

15          And, Mr. Peterson, as I said, I very much appreciated

16    your letter in this case.

17          THE DEFENDANT:  Thank you, Your Honor.

18          THE COURT:  Ms. Jahn, is there anything further?

19          MS. JAHN:  No.

20          (Off-the-record discussion between courtroom deputy

21    and the Court.)

22          THE COURT:  There's no term of supervised release, as

23    this is not possible under this statute, and, therefore,

24    there's no conditions of supervised release after his release

25    from wherever he is sent.

1           All right.  Thank you, everybody.

2           MS. JAHN:  Your Honor, I did have one.

3           THE COURT:  Yes?

4           MS. JAHN:  The probation recommendation requests --

5  well, I guess -- I'm sorry.  In terms of reporting to Bureau of

6  Prisons for the 30-day period, would you make a recommendation

7  that it be as close to his residence as possible?

8           THE COURT:  Yes.

9           MS. JAHN:  Thank you.

10          THE COURT:  And at this point I don't know where

11 people have been sent.  But the defendants are from all over

12 the country, so it's been different.  But I will also put that

13 as my strong recommendation in the judgment and commitment

14 order.

15          MS. JAHN:  Thank you, Your Honor.  He resides in

16 Rochester, Pennsylvania.  So if you note that, that city, that

17 would be helpful.  And the only reason why I'm asking is that,

18 obviously, COVID has had an impact on facilities taking new

19 persons.  And I suspect it will decline, given now where we're

20 headed in light of the variance.  That's why I'm asking for

21 that request.

22          THE COURT:  All right.  I will request that.  And I

23 know that's something the Bureau of Prisons takes into

24 consideration anyway.  But I will make sure that's written

25 down.  All right.  Thank you, everybody.

1              MS. JAHN:  Nothing further.  Thank you.

2              MS. JAWAD:  Thank you, Your Honor.

3                           *   *   *

4

5

6

7           CERTIFICATE OF OFFICIAL COURT REPORTER

8

9       I, JANICE DICKMAN, do hereby certify that the above and

10    foregoing constitutes a true and accurate transcript of my

11    stenographic notes and is a full, true and complete transcript

12    of the proceedings to the best of my ability.

13                      Dated this 1st day of December, 2021

14

15

16                    _____

17                    Janice E. Dickman, CRR, CMR, CCR
                       Official Court Reporter
18                    Room 6523
                       333 Constitution Avenue, N.W.
19                    Washington, D.C.  20001

20

21

22

23

24

25